The next case is Carolyn Fylling v. Royal Caribbean Cruises. And Philip Parrish is here for the appellate Fylling. David Orr is here for Royal Caribbean. And Mr. Fyling, you may begin when you're ready. Good morning, may it please the court, Philip Parrish, it seems to my left, Mike Erickson, trial counsel on behalf of the appellate Carolyn Fylling. I've raised a number of issues and the court's permission to begin where the trial began, which is with the voir dire, referred to as perfunctory in the briefs. And perfunctory is kind of a long word with a short meaning. But the voir dire in this case was very short. It was done completely by the district court, which is permitted by Rule 47. Mr. Parrish, can I just can I just ask you, because I am concerned about the voir dire. So my understanding is once the jury was selected, I guess the jury went back. I don't know if they went back to the jury room, but at some point in time, it became clear that one of the jurors who had been selected had a family member who was actually an employee of Royal Caribbean, and that was brought to the attention of Judge Martinez. And at that point in time, he did not bring her in to do any further questioning. Correct. And just at the very end of the voir dire, another juror had volunteered in response to one general attitudinal question about whether there was anything that they thought might affect their impartiality, had reported that he was he called himself an investor. I assume he's some form of stockholder. We don't know how much. And without any statement by either of the attorneys, the trial court said, well, that's easy. You're gone. You know, you're excused. Then just a few minutes later, because after they went through and selected the jurors, by the way, requiring the plaintiff to exercise all three of his peremptories before requiring the defense to exercise any. They only had to use one. And there were no real there were no cause challenges because, you know, very little had been obtained other than the general information from jurors. So after the jury went back and the the the juror, her name was Paulette Chuck, apparently informed someone identified as Diane, the court clerk, that, oh, by the way, my niece is employed by the defendant Royal Caribbean. Obviously, maybe there had been a little bit of time. It took her to realize what the other gentleman had said. And so she thought she needed to bring that to the attention. We don't know exactly what you thought, because, again, the court declined to bring her out for any questioning. And he said, I wouldn't I don't think that's a question that would cause me to excuse her for cause. He said, when we expressed our concern, he said, I understand your concern. And he said, he said, I'm surprised that you didn't disclose that. But he nevertheless said, look, you know, I'm not I'm not going to excuse her. I don't even ask that question on. Did she say that the fact that her niece works for Royal Caribbean would influence her anyway, or did she say that I can disregard that and I can serve fairly and impartially as a juror? Well, she didn't get a chance to say anything during the war, dear, about that, or she didn't volunteer when that general question was asked that prompted the other gentleman to say something. She told the clerk and we don't know. The issue here is that she was never brought back. Right. And the other issue is that there was never a general question because really, the voyagee was conducted by the district court judge. Correct. And he didn't even which is permissible. Yes, it is. But there was not a general question, which is like a normal question, which is does anyone here know any of the parties or any of the lawyers or anybody involved? That's a basic general question, but that was not asked. Right. And so they were asked if they knew the witnesses. They went through that sort of thing in the council, even Royal Caribbean's questions, because the judge in this pre-trial order said, you know, by a certain date, parties will give their requested questions and both sides did. Royal Caribbean had a series of questions about whether anyone worked for the cruise lines or had a relative who worked for any of the cruise lines, not just Royal Caribbean, but, you know, it could have been Carnival, NCL, any of the other cruise lines. And he didn't ask any of those questions. And even after this came out, he didn't isolate the juror, bring her out. And he said, I don't want to excuse her because we have eight jurors. This was, you know, tried during COVID and COVID. And but at the end, he said, I'm going to keep her as an alternate. Right. Right. And at the end, I'll excuse her if we have a full complement of jurors. And they did. And at that point, he said, no, I'm not going to. But I don't I wouldn't have asked the question about about relatives anyway. And I don't think it's sufficient for basically, I guess, cause or. When when it came time to deliberate, she stayed on, even though you still had. So you had eight jurors who deliberated. Correct. Correct. And we had a 90 percent comparative negligence finding in this case, which I guess gets us. I believe you objected still. Oh, yes. Yes. We objected and we objected after the jurors were sworn in and objected at that time as well. There was no claim of waiver in the answer brief. So we believe that the issue is is well preserved. Let me ask you this before you pivot. It sounds like you're about. Yes. So is it your position that that any time evidence arises of a familial relationship like this, either the juror needs to be excused or there needs to be further questioning? And if it's not sort of a per se rule, what makes this situation uniquely abusive of the judge's discretion? I would say, Judge Newsome, that at a minimum, there needs to be further questioning. So just so I'm clear, this is helpful. So every time in every case, if any familial relationship, I don't know what degree of separation arises, definitely either excuse or further question. Yes, I think so, because especially when you have had no such a short voir dire with no questioning from the parties whatsoever, the case law says that obviously the parties are much more familiar with the issues. And again, we had questions presented to the court in writing by the defendant asking about relatives. And this was a niece. The juror did say in her in the voir dire that she had two grown children. So presumably, you know, and obviously this woman, the niece lives in Miami, the juror and her two kids. We don't know the age of the employee, but maybe they got together all the time as friends. We don't know. Maybe she worked for the claims department and made all kinds of statements about frivolous lawsuits. We don't have no idea. So so after she brought the matter to the attention of the trial judge, did she was there any indication after that that she said it wouldn't affect my impartiality? No, she was never asked. There was never anything said after that. And then it was presumed by Mr. Erickson, obviously, that when it got to the time for the jury to liberate, because there were sufficient jurors that she would be excused. And then it became as a big shock that that she wasn't. But in any event, there were if there were no further questions on that issue. One more. So sorry. So on. I just have a question about the the language of Rule 47. So Rule 47 says, as we all agree, the court may permit the parties or their attorneys to examine prospective jurors or it may it may itself do so. If the court examines the jurors, as happened here, it must permit the parties or their attorneys to make any further inquiry. It considers proper or must itself ask any of their additional questions. It considers proper. That to me sounds like almost unreviewable discretion. Like by what standard do we measure the district court's own determination that it didn't deem these inquiries proper? This seems to like best discretion almost exclusively in the district court. And at the very least, seems like. If we're applying abuse of discretion, it ought to be like on steroids, given the language of the rule. Well, so it's I think it's an abuse of discretion standard as to whether the trial judge permits any of the questions that were proposed to be asked. But the fact that the rule says it considers proper doesn't mean that you are that you've got some kind of abuse of discretion on steroids. It means it's an abuse of discretion. Obviously, what it's saying is it's not like really breezed past. But I mean, don't you think the language here is unique? I don't I don't recall seeing language like this that seems to say that the district court can do it if it wants to basically if it thinks it's proper to do so. I mean, frankly, I think it would be an abuse of discretion standard, an ordinary abuse of discretion standard, if it said it must permit the parties of their attorneys to make further inquiry or must itself ask their additional questions. Then I think we would be like, well, abuse of discretion. Did he do it? Did he did he not do it? But here it's got that extra phrase that does seem to almost best it exclusively in the district courts. So but but if if the district court is not going to ask any of the questions that the parties raise, the district court still has the duty to conduct an adequate voir dire in this court's authority. I cited the lips case, which is unpublished, but it cites to the Xena and old Fifth Circuit case, which is which is binding. It says when the trial judge conducts the voir dire, it must be conducted so competently, completely and thoroughly that the prospective jurors histories and personal prejudices are revealed. And that clearly did not happen here. And I'm asking this court to say in an opinion that any time the district court judge refuses to ask the questions that the parties have submitted, that's that's error. I do think you can look at this case. I mean, it's almost like the old Potter Stewart standard. I think, you know, a bad voir dire. That's a case that you were citing from the Fifth Circuit. Yes, that's a case that you were citing. That's the Xena versus Theriot Marine Services. It's six ten second two fifty one. But in the United States versus now, which is the former Fifth Circuit in that one, the former Fifth Circuit reversed and remanded for a new trial because the district court failed to adequately question a potentially biased juror. Yes, yes. There's plenty of authority, I think, to apply to the facts of this case without going to a discussion about because it's not simply a matter of whether he asked those questions. I think it's advisable. And in now, if I'm correct, the juror, the potential juror actually disclosed the information during the voir dire process. And we found that that was reversible. And in this case, it's even I think it's a little worse because it happened after the fact and the district court judge did not bring the person back to do further inquiry to determine whether or not they could be impartial. Correct. Yes. Seems like you would have a stronger case, though, if it was discovered after the trial. That a juror was had a relative working for the defendant, but how do we take into consideration the fact that the juror raised her hand during the trial to bring the matter to the attention of the court? And there's no other evidence in this record that the juror could not. Participate fairly and impartially. Well. Several things. Mike, Mr. Horton said in the answer brief that, well, it seems like she obviously that suggests that she's an honest person and it's not biased, but that's kind of circular reasoning. We also could also mean, oh, wait a minute. You know, you asked that one question at the end about bias and that gentleman mentioned that. And now that I'm thinking about it, you know, my niece works there and maybe I'm a little biased, but we don't know. She never got asked the questions. And, you know, it's you can never know with the whole point here is have an adequate ward here when something comes to the court's attention, inquire into it. And this is I mean, it's unusual. I've been, you know, sat through many board years in this district because all the cruise line cases are here. And you almost always have somebody who has a relative who works for one of the cruise lines or they go on all the cruises. They don't even have to drive down I-75 for 12 hours to get on the boat. They just drive from Kendall or wherever and get on the boat. So to not ask any questions like that in a case against the cruise line to to develop some see whether there are biases. I mean, we have a that's a pretty close relationship. Niece, who obviously lives in the same town because she works for Carnival. I mean, for Royal. So I don't think the fact that you might find out later is an indication. This actually gave that it's almost worse in my mind. It gave the district court the opportunity to nip it in the bud, whether whether it be by further questioning. That could have either established that there was bias or to the courts. Determination not established that there is bias. And then then we know. And then again, the issue at the end of the trial, why not? Excusing her at that point when when she was unnecessary. Can I ask you a quick question? I know your time's running short. In part, it's my fault. Oh, no. I've been answer all the questions. Will you talk about four or three for a minute on the videos? Because just speaking for myself, I think it might have been error to keep the videos out. I do have a question about whether it was prejudicial. And here's the reason I ask. The videos would seem to go to establishing Royal Caribbean's negligence. But the jury found Royal Caribbean negligent. Right. How did the videos go to establishing or disestablishing comparative? So the videos first, the jury barely found them liable. They found them 10 percent liable. And they know they've seen many passengers come through here. This is Miss Filing's first time at this vessel. The the incline is camouflaged. So we have a huge comparative finding here. And so it all goes to whether I think that helps create the 90 percent. They were able to say and they were, you know, they were careful to make sure that no other reported falls, because other people who stumbled may not have fallen and been injured the same fashion as falling. But they did stumble. We have we would have had the percipient testimony of both the expert and the plaintiff who went to the vessel later and saw people stumbling. And and there's certainly yes. The question I have, though, is if you've got videos of other people stumbling, how does that do anything to diminish Miss Filing's comparative negligence? It's not evidence about her. Right. It's evidence. It's evidence about RCL that RCL was found. It's evidence that people will have difficulty encountering this thing. And remember what Dr. Horsemire gets up on the stand and says completely not in his reporter's deposition. Oh, I looked at the video and I know all this. I think she's probably under the influence of drugs at the time. Maybe I should ask it this way. What what was the evidence at trial that established? I'm sure you would say none. But what was the evidence that went to your client's comparative negligence? She was comparatively negligent because why? Well, so it was Royals position that this really isn't a problem, that there have been a quarter of a million passengers who had safely encountered this this slight incline. They admitted that it was in the same condition there. It sounds like they're saying it's not it's not we're not liable. We're not liable. It's actually negligent. I mean, when they turn the fire on her and they say, like, well, in any event, she was negligent because how does that sentence get filled in? Well, it's she was negligent because she fell here. Everybody else who got on the vessel, there's been no other reported falls. And therefore, I mean, that's evidence that goes both to whether or not there's a danger there and evidence that goes to. OK, but if there's if it's a danger, how much of a danger is it? Isn't this almost all her fault? So Royal Caribbean never said she sort of she was comparatively negligent because of some conditions specific to her. Well, I mean, so Dr. Horsemeyer, again, not previously disclosed. And then we we asked to go sidebar on this and the district court disallowed it testifies. Well, you know, I've looked at video and she doesn't seem to, you know, I guess what you're saying is put her hand out to stop her fall. And I think that might be related to the fact that, you know, we know that she had been given oxycodone for prior injuries or she had had orthopedic injuries and surgeries and and things like that. And so all of that kind of went together on their on their comparative negligence. But it was I mean, that's that's sort of the elephant in the room with, you know, never been reported that there's been any other injury here. But Ms. Filing falls on it. So, hey, how do we get to 90 percent for someone who's encountering this for the first time when they when they know that, you know, that's where the Stumbler videos come in. So, you know, I think there's a lot of evidence of the fact, especially when they're saying they're defending that it's not a problem. Having this could show to the jurors that, yes, you know, this is a problem. Maybe they should take that. So camouflaging came off of the magistrate judge had allowed it and the magistrate judge issued a reporting recommendation. Yes. And Royal did not file a. Did they file a motion limiting or any objections? So we. Yes, they did. They filed a motion limiting, saying that the video should come out under ninety point four or three, which this court says is to be used sparingly. And again, it's not as if usually you think of some. Either prurient or, you know, hugely prejudicial evidence that gets stricken by ninety point four. But I say nine point take in Florida by rule four or three and not. I mean, the judge acknowledged that it was it had some probative value, although he referred to it as anecdotal. But the fact that it's other passengers encountering this for the first time, just like she did. I mean, that the fact that it's these individuals, it's it actually shows that it's random. It's not something that was staged. It went into the experts conspicuity, whether whether or not this was conspicuous or not, if I'm not pronouncing conspicuity well enough. So, you know, it all tied in and it definitely affected the, you know, the finding on on comparative negligence. I think I'm way into my time. I don't know. I'm sorry. So just to clean up one, I'm sorry that I might have sort of misled this conversation by saying I think it might have been error to keep it out. But it wasn't prejudicial, recognizing that prejudicial is part of the board. What I really meant is like reversible. And I understood. I understood what you meant. But so your contention, I guess, I just think this is sort of, I don't know, conceptually difficult to figure out with respect to comparative negligence. Your contention is that the relationship between a negligence finding and a comparative negligence finding is necessarily sort of symbiotic and hydraulic intertwined. You can't sort of segregate them. Correct. Last question. So the verdict form, I think. Tell me if this is right. But the verdict form says something like was Royal Caribbean negligent to if so, what were your client's damages? Three, was she negligent and how much or sort of, you know, to what extent? That does seem to me to sort of segregate negligence and comparative negligence determinations instead of recognizing that they are symbiotic and hydraulic. Well, but I mean, that's every verdict form in every personal injury negligence case is situated this way, because if the jury finds that they weren't negligent at all, then they don't have to get to the second question, which asks if the plaintiff was and then if so, to compare them and give a percentage. It's. Obviously, we got a verdict, you know, but this is not one of those cases where we're complaining about something that went to our benefit. There was a seven hundred fifty thousand dollar verdict reduced to seventy five thousand dollars. Exactly what Mr. Hoard told them. If they were going to give anything, maybe get seventy five thousand dollars in his closing argument. And that's 90 percent. That's a heck of a lot of. You know, there was, you know, again, a lot of times on cruise ships, the person's had four or five drinks. You know, the cruise plane wants to. It's happy to sell you. And then they trip and fall. And, you know, you can understand where a hefty amount of comparative might be presented. But this is the first time this woman is entering the ship. And, you know, we are not permitted to show that other people have problems. They may not have gotten injured the same way she did. But I think we started a case that indicated that near misses are just as probative of whether there's a danger there. But these issues are intertwined in the jury's back. They're deciding, OK, yeah, we found them liable. OK, so are we going to find them 100 percent liable? We're going to find them 80 percent, 70 percent, 50 percent. And they end up with 90 percent on the plaintiff when seemingly this is a very nice woman with a great job, not looking to get rich off of tripping and falling. And she she does trip and fall and hurt herself. And the jury awards the terms 90 percent comparative. We think that all of the I don't want to waive for rebuttal if I have any time left. And the other arguments I've raised, but we've let you go way, way over. Thank you, Mr. Barish. We'll hear from Mr. Hoare. Good morning, police court. Let's let's jump right in. Tackle what there is. Judge Legault, you started by saying you're concerned for that. And then Judge Wilson and Judge Newsome, you had some questions. Rule 47 does vest the trial court with considerable discretion here. In addition, the Supreme Court of the United States has recognized that reviewing courts are properly resistant to second guessing. The trial judge's estimation of a juror's impartial impartiality. But don't you have to first determine impartiality? Well, let's talk a little bit more. Contextually about what went on, because factually, there's a little more that's been discussed so far. When the trial court posed the question to the entire panel. Well, can you think of any reason why you can't sit on a jury and render a fair and impartial verdict based on the evidence in the law, as I instruct you in the court? I understand that she said I read the record, sir. I don't know. But I think so. I understand. I understand that he asked that general question and she was affirmative. She said yes, so she could be impartial. The problem is that once the jurors were selected. And they went out of the room. And I don't know if it was a J.A. or whoever it was, or the courtroom deputy came back and indicated because obviously this juror thought, well, I maybe should let them know. And pose this question to the courtroom deputy. I think my niece has is a employee of Royal Caribbean, i.e. a party. Is that not something that should be addressed? Well, your honor, the answer to the question is it's by Rule 47. It's the discretion of the trial court. Number two, for the specifics of what went on here, there's more evidence to consider whether it should have been addressed. And we think it wasn't necessary. Let me explain why, please. When the judge posed the question the first time, Chuck didn't say any kind of a concern. Another fellow did. Another fellow said he raised his hand. And when the trial judge went to him, he says, what's your problem? And he responded, I'm actually an investor in Royal Caribbean. So problem, investor, he disqualifies himself. It wasn't just some arbitrary thing. The guy had come out and said, I can't do this effectively. Then, this is very important now, after the specter of some relationship to Royal Caribbean has been raised, both by that exchange and by the investor's response, Judge Martinez asked the question again. He says, anybody else, can anybody think of any reason why you could not be fair and impartial? All right, so juror Chuck is sitting right there for all of this. I understand that. Then afterwards, when she is selected, she raises this concern that her niece is an employee. So all of a sudden, clearly, she has a concern and she raises it. Why does she raise it? We don't know because nobody bothered to bring her in and question her. Judge, with all due respect, you've added the term concern. There wasn't a concern attached to it by juror Chuck. It was a matter of the courtroom deputy. My niece works at Royal Caribbean. She didn't say this is a concern. She didn't say or disavow or back away from the two instances where she denied any concern. Do we know if she was an employee for the legal department? Do we know what kind of employee she was? The niece, we know nothing about. We don't know anything about it. And neither does Mr. Parrish or his client. No, but I think from the standpoint of what the legal standards are, juror Chuck, A, never professed any concern about being fair and impartial. B, the trial judge who was there on the spot and assessing all the variables involved, both at the time it came up and then as the course of the trial progressed. At the end, his commentary when the issue was raised again was, well, I've been observing her during the course of the trial and there's nothing that she has done or acted to suggest any impartiality. So how do we deal with the Nell case? I'm sorry? How do we deal with the Nell case from the Fifth Circuit where the court said, because the court failed to explore the jury's potential bias adequately, it did not employ a procedure creating a reasonable assurance that prejudice would be discovered if present. I think we rely on the articulation from the trial court himself when he said, I think the two instances of hers telling me that there was no concern about fair and impartial or inability to be fair and impartial. I think those suffice and they don't create a concern for her unfairness or lack of lack of impartiality. So I think it was addressed. Can I ask you just a quick question about you've said in addition to the two instances up front where he said, you know, can you be fair and impartial or, you know, she expressed no inability to be fair and impartial. Right. Got it. When he says on the back end, like I've been watching her during trial and she hasn't done anything to give me pause. What does that even mean? Like what would she have done? Sneer, snicker, thumbs down. I mean, I don't really know what he was looking for. I don't either, actually, Judge Newsome, but I think that's where the aspect of rule 47 comes into play, because here's a jurist who's been on the bench over, I think, at least over a decade. I don't know the exact facts. He's seen a lot of this. So to borrow from Mr. Parrish's paraphrasing of Potter Stewart, you know, he'd know it if he saw it, apparently, based on his experience. I wouldn't purport to necessarily know that. But I think that is a communication of the trial court articulating his discretion in rendering a decision. And I think it goes to what Judge Wilson was talking about. What evidence do we have? We have a little more evidence, I think a lot more evidence. And I think the purpose in terms of establishing that Chuck didn't feel she had any concerns is filled. I think the purpose of the voir dire is to ascertain whether this disqualification was fulfilled by her own conduct. Second issue, the videos. Judge Newsome, you brought those up. Let's talk about why they're not competent evidence. In the 11th Circuit, prior incidents are accepted as competent proof of constructive notice of a dangerous condition, if and only if the threshold criteria of substantial similarity is met. Incidents prior or after are never admissible as proof of negligence because every accident stands on its own. If the aspects of substantial similarity are met for prior incidents, then they can be admitted as evidence with an instruction that they're to be considered by the jury as to whether the ship owner knew or should have known of a dangerous condition. Second, appellant cites no authority that subsequent events are probative of a ship's notice for an accident which happened before. In fact, this court in Frosca v. NCL says subsequent falls are not probative of notice of a dangerous condition before the plaintiff's fall. Now, the cases that are cited by appellant don't address issues of admissibility at trial of evidence about other subsequent falls. They deal with issues at earlier stages of those respective proceedings. I think both of them dealt with discovery things where we all know the scope of what's permitted is much broader than what ultimately turns out to be admissible at trial. Even if we had no precedent to go on, this was the first 403 case that had ever been decided. You don't think, I don't know, 15 videos of people tripping and fundamentally at the same spot are probative at all? After the fact, no. The reason being is the issue is whether Royal Caribbean would have had notice of a dangerous condition involving Mrs. Filing. So, how can something that happens 18 months be probative of what went on with Mrs. Filing? Well, there's like a chronic problem. Well, the other thing is there's no evidence that there was an existence of this information for Royal to know before Mrs. Filing fell. Remember, from a legal perspective, it's only probative of notice. It's not probative of fault. So, the fact that something 18 months later is observed doesn't establish that anybody should have known about it before Mrs. Filing fell or could have known about it. It's totally speculative in that regard. And I think that's a chief reason why it was proper to exclude these things. How many incidents were on the video? I'm sorry? On the video, how many incidents? I don't recall the number. My number was far less than 15. It was like, I thought it was in single digits, but again, I don't profess to exactly recollect. Can I go back for a second to the voir dire? Absolutely. You're in charge. The district court judge tells, indicates that my courtroom deputy was talking, getting information from the jurors and said one of the jurors said that her niece were actually the defendant. And he tells them who it is. And obviously, Mr. Erickson says, my judge, the plaintiff is concerned. And the district court says, well, of course, I can understand that you're concerned. And the judge expresses surprise that she wouldn't have raised this issue with the juror before. My concern is, the judge says, I didn't ask if there was anything in their background that would make it difficult and possible for them to be fair. And then Mr. Erickson says, one of our concerns is that the juror in question is going to be reluctant to return any kind of significant verdict. And the district court judge says, well, I kind of doubt that this is the kind of case that is significant to put them out of business, i.e., Royal Caribbean. I mean, is that not an abuse of discretion? How is that a proper consideration to determine whether someone is impartial? I think, Judge, that he also goes on to further elaborate that she didn't identify that she thought she couldn't be fair and impartial. I think that was one comment. And then there are there are other grounds that played in both then when the trial court was talking about it. And then later on after after the trial, the evidence concluded when Mr. Erickson raised it again. So I think that that one comment, I don't think, is necessarily indicative of what point of decision was for the trial court. I think it certainly plays into his explanation of his articulation of how he's exercising his discretion. But in the totality of it, there were other reasons expressed as well. And I think foremost among them were what I talked about before, this notion of the context in which it happened. I mean, it's not something like this kind of goes to like the absolute fairness of impartiality of having an impartial jury. And I think that was ensured here because that Mrs. Chuck twice committed to it once after the notion committed to it before she gave indication that she had a relative who was an employee of the defendant. But this is true. But but she knew she would have known that all along. It's not something that she may have. But she did. Right. She didn't learn about the niece after she was selected. She presumably would have known about her niece beforehand. Judge Newsome, you raised an inquiry about what evidence was there of Mrs. Filing's comparative. Let's talk very specifically about that. From the perspective of liability, Mrs. Filing herself identified multiple conditions on cross-examination and conceded they negatively impacted her mobility capabilities. Let's talk about. Pelvic and toxic surgery. When a plaintiff's own experts, Dr. Lickbaugh conceded this impaired her mobility capacity. Bilateral Achilles tendon injuries and surgical repairs. Severely degenerated arthritic right knee for which knee replacement had been recommended pre accident, but not pursued. Vertigo and labyrinthitis issues. Documented in the medical records as active problems as at the time of the accident. Vitreous detachment issues in both eyes, creating floaters and dizziness, negatively impacting her ability to perceive and balance. Shortly before the incident, November of 2016, Dr. DeCuney, a primary care doctor, prescribed her meclizine two times a day for dizziness. The evidence showed as Mrs. Filing approached to come aboard the vessel. In addition to these medical issues, she was fatigued and tired from dragging two sets of piggybacked luggage bags up several levels of a zigzag jetway network at Port Everglades that you have to negotiate before you even get to the vessel. The porter who was pushing her, husband in a wheelchair, said that she was struggling to keep up. The defense liability expert, Fauzi Bayan, showed the jury what Mrs. Filing saw from the vantage point of where the porter left her to take the husband in, as you see in the video. And Mrs. Filing conceded from this perspective. She looked into the ship for a matter of minutes and she could see what ultimately turned out to be the accident site. She was able to see others going up the ramp that she complains about while she was in the position waiting for the porter to return. Importantly, Fauzi Bayan, the liability expert, also did an accident reconstruction he displayed to the jury. He showed the jury Mrs. Filing's foot rotated because of her old goose-fitting shoe she was wearing and that started to fall. This showed the jury it wasn't a function of the incline, it was a function of the loose shoe that Mrs. Filing was wearing that started her fall. These elements combined to demonstrate that the jury's determination of 90% negligence for Mrs. Filing for the fall was a very reasonable result. Where am I in time now? I'm totally confused. Okay, thank you very much for your attention. I appreciate it. Thank you, Mr. Hoare. Mr. Parrish, you kept your rebuttal time. I want you to present however you want to, but sometime during the rebuttal, would you please address the litany of evidence? When I asked you, like, what was the evidence about her comparative negligence? You said, like, you basically said kind of like nothing, really, it was all about Royal Caribbean. This is the crux of my question about the 403 evidence, is that the videos, I think, if anything, go to prove Royal Caribbean's negligence. But the jury nonetheless found your client 90% comparatively at fault. And now it sounds like there's a lot of reason for that that has nothing to do potentially with the incline. A plaintiff's physical condition is not evidence of comparative negligence. This jury was led to believe that she's the only person that ever, that made it much more prejudicial to bring up all these issues about her. And certainly many people who go on cruises are not in perfect health, but that's not evidence of comparative negligence. That's evidence of her preexisting conditions, all of which were distinguishable from the injury she sustained here. So all of that, I don't think, goes at all toward comparative negligence. This is her first time appearing and encountering this camouflaged incline. Their defense was it's not dangerous, and if it is, it's open and obvious. That's why the Stumber videos are important, not for notice. We weren't trying to establish notice. We know that you can't use subsequent incidents to establish notice prior. But when they're saying it's not a danger at all, but if it is, it's open and obvious, then, well, maybe it's not so open and obvious to these other people who maybe because they don't have these other issues or for whatever reason, they don't fall and get injured the same way. It still goes to the when you're claiming there's no danger at all, then evidence of subsequent. And we cite the excellent case. I know it's a district court decision from D.C., but it really. The evidence is relevant. Yes, but it was excluded pursuant to rule 403 and rule 403 says the court may exclude relevant evidence. And it gives a number of reasons why it can exclude relevant evidence. And one is if it involves confusing the jury. Another is if it involves wasting time. If the court had admitted this in the evidence, couldn't it have just opened up this case to a separate trial with regard to each incident? How many other incidents were on the videos? It seems to me that was probably the concern. Well, so there were judges with this. Let's say there are 15 incidents on the video. Then you got a separate trial about each one of those incidents. Well, I would confuse the jury and it would involve a waste of time. So I don't it wouldn't have taken a lot of time to show these few very short videos. I don't think there were 15 incidents, but there were several. And this is just with short videos taken on another day of embarkation when we're there to inspect. It's just a video. Nobody has taken any depositions of the people, but you can see at least that people have difficulty. And when their defense is it's not... For each one of those other incidents, there might be a different reason why the passenger fell. And so then, boy, you're really going to extend the trial because then Royal Caribbean will have an opportunity to show there were other reasons why these other passengers fell. Well, I guess the introduction of any and all evidence is going to extend the trial somewhat. But it's just a video. And you can argue that we don't know why they stumbled. But when you're basically able to sit there and say we have no other reported incidents of stumbling, this is basically a one off. That has I mean, and yes, the jury... Keep in mind, the judge was making this decision before trial. To the jury, to the jury that we haven't had any other incidents of passengers falling. Yes, that was one of their main arguments. Yes, no other reported incidents. They kept the word report in there because it distinguished cases where somebody was injured badly, which gets reported in cases where people merely stumble, which doesn't get reported because they don't get injured. But when your defense is and, you know, and again, we get that comparative cannot be this. Royal Caribbean's evidence that there was no other reported incidents from their from their corporate representative. Yes, and that was one of their big defenses. So when when the jury says, hey, this she's the only person in the history to have a problem with this. I mean, actually, in those circumstances, amazingly, they did find liability on Royal Caribbean because this evidence was kept out. But they found 90 percent comparative. They were not. So they were comparing. They they were told basically that she's the only this one person has ever happened to. And that's not the case. Nobody else supposedly, you know, they don't have any evidence of a reported injury prior to this. It had been the ship had been in use for about 10 months. So it's not a ship that's been out there for 10 years. And so the corporate representative testified that there were no other reported incidents on this entrance ramp where the where the plaintiff slipped and fell. Correct. And and they had other witnesses because they stationed people right there. In fact, right before she stumbled, you know, the person's standing there to greet her, said hello. And she said, thanks for something like that. A rotten board. She said, thanks. And then she stumbles. That person testified that I'm there all the time and I don't see people stumbling. Well, that would certainly have this. This evidence would certainly have contradicted that. They say there were no other reported incidents on the day with regard on the day. So they just you know, this is my job. I've never seen anybody stumble there. And and we have, again, our expert who undertook a conspicuity analysis and then was unable to utilize it at all. Because, again, it's it's a fine line. Is there it's a slight incline. It's camouflaged by the painting of the Royal Caribbean insignia. And you have to go explain to a jury why it's even when it's a you know, it's not a huge gap or a huge impediment. Why that matters when you're walking. And so the expert was unable to testify that as well. So that's another reason why the rule four or three analysis also requires reversal. Thank you for extending the time and request that the court reverse. Man, thank you. All right. Thank you, counsel.